UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
LINDA M. FREEDMAN AND STANLEY                    Case No.  1:23-cv-472
SPERBER,

            Plaintiffs,                                      **COMPLAINT**

   -against-

MICHAEL F. RAKOSI, SUSAN RAKOSI
ROSENBLOOM, AS ATTORNEY-IN-FACT
FOR STANLEY ROSENBLOOM, and WEBER
REALTY MANAGEMENT LLC,

            Defendants.
------------------------------------------------------------X

      Plaintiffs Linda M. Freedman and Stanley Sperber ("Plaintiffs"), by their

attorneys Schoeman Updike & Kaufman LLP, complaining of defendants Michael F.

Rakosi, Susan Rakosi Rosenbloom (as attorney-in-fact for Stanley Rosenbloom) and

Weber Realty Management LLC ("Defendants") (collectively, Plaintiffs and

Defendants may be referred to as the "Parties"), allege as follows:

## PRELIMINARY STATEMENT

      1.     Plaintiffs are two of three current partners in four real estate

partnerships.  Plaintiffs bring this action to enforce their vote to replace the

partnerships' managing agent, Weber Realty Management LLC ("Weber").

Plaintiffs seek to enforce decisions properly made by the partners at their December

28, 2022 meeting and request a permanent injunction prohibiting Weber from

continuing to act as managing agent for the partnerships and a declaratory

judgment that Stanley Rosenbloom ("Rosenbloom"), is no longer a partner with

voting rights.  Plaintiffs also seek rescission of the partnership agreements based upon the fraudulent inducement of them by defendant Michael Rakosi ("Rakosi") to enter into those agreements.  Plaintiffs also seek a declaratory judgment that the anti-dissolution clauses in the partnership agreements are invalid in that they operate as a complete bar to judicial dissolution.

## JURISDICTION

2.     This Court has jurisdiction over this case under 28 U.S.C. § 1332 in that value of the property, partnership interests and management agreement related to which declaratory and injunctive relief is sought exceeds the jurisdictional limit of $75,000 and there is complete diversity of citizenship between Plaintiffs, who reside in California and Israel, and Defendants, who reside in New York and New Jersey.

## THE PARTIES

3.     Plaintiff Linda Freedman ("Freedman") resides at 1145 South Camden Drive, Los Angeles, CA 90035.  Freedman is a partner in the four real estate partnerships.

4.     Plaintiff Stanley Sperber ("Sperber") resides at 14 Oppenheimer St., Apt. 3, Tel Aviv 69395 Israel.  Sperber is a partner in each of the four real estate partnerships.

5.     Rakosi resides at 1735 York Ave., Apt. #38E, New York, NY 10128. Rakosi is a partner in each of the four real estate partnerships.

6.     Defendant Susan Rakosi Rosenbloom ("Susan") is the attorney-in-fact for Stanley Rosenbloom ("Rosenbloom") who had been a partner in each of the partnerships until he became incompetent.  Although Rosenbloom owned a residence at 3371 Frederick Street, Oceanside, NY 11572, on information and belief he resides in New Jersey with or near Susan at 315 Cupsaw Dr., Ringwood, NJ 07456.  On information and belief, based upon disclosures made by his family and his inability to fulfill his duties as a partner since at least August 2021, Rosenbloom is legally incompetent as that term is used under the partnership agreements.

7.     Susan holds a power of attorney from Rosenbloom, which may or may not have been signed before he became incompetent.  As shown below, Susan may also be Rosenbloom's Personal Representative under the partnership agreements.  As Rosenbloom's Personal Representative, she is entitled to receive or direct partnership distributions on Rosenbloom's behalf as an economic interest holder, but she is not a partner in the partnerships.

8.     Defendant Weber's principal address is 236 West 26th Street, Suite 805, New York, New York 10001.  In 2017, Weber was appointed manager of the four real estate partnerships.  Presently, Weber is holding over as manager despite a vote of the majority of the voting partners to terminate the partnerships' management agreement with Weber.

## **VENUE**

9.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this

District, all of the property that is the subject of the action is situated in this

District, and Rakosi resides in the District.

## STATEMENT OF FACTS

### The Four Real Estate Partnerships

10.    The four real estate partnerships own a total of ten valuable rental

buildings in Manhattan.  The four partnerships are Franklin Holding Co.

("Franklin"), Windshire Apts. ("Windshire"), Belkar Holding, Co. ("Belkar"), and

RSR Holding Co. ("RSR") (collectively, the "Partnerships"), and are operated as a

single business.

11.    On November 2018, Freedman, Sperber, Rakosi and Rosenbloom

entered into the four identical written partnership agreements concerning the ten

properties.  *See* Agreement of Partnership of Franklin Holding Co. ("Franklin"),

Agreement of Partnership of Windshire Apts. ("Windshire"), Agreement of

Partnership of Belkar Holding, Co. ("Belkar"), and Agreement of Partnership of

RSR Holding Co. ("RSR") (collectively, the "Partnership Agreements").  The

Partnership Agreements are attached hereto and incorporated by reference as

Exhibits 1-4.

12.    The Partnerships were formed pursuant to New York Partnership Law

for the stated purpose of owning, managing, operating, profiting from, and

otherwise dealing with various properties located in New York, New York.  *See*

Partnership Agreements (Exs. 1-4), § 1.3.

13.     Until Rosenbloom became incompetent, Plaintiffs, Rakosi and Rosenbloom (the "Partners") each held a 25% voting interest in the Partnerships. *Id.*, Ex. A. Going as far back as 2018 when the written Partnership Agreements were signed, the Partners' efforts to make decisions about the operation of the Partnerships frequently resulted in a deadlock because any action, including day-to-day management of the Partnerships, required approval of a majority of the voting partners. Repeatedly, two partners holding 50% of the voting interests (generally, Rakosi and Rosenbloom) voted in favor of or against an action while Plaintiffs, holding the remaining 50% voting interests, voted to the contrary, preventing a majority vote from being achieved.

14.     Freedman, Sperber, Rakosi and Rosenbloom were Partners from at least as early as 2018 until the time the Rosenbloom became incompetent.

15.     As a result of Rosenbloom's incompetence, there are three voting Partners: plaintiffs Freedman and Sperber and Rakosi, each with a 33.33% voting interest in the Partnerships.

**Because Rosenbloom Is Incompetent, He Is No Longer a Partner and No Longer Has Voting Rights Under The Partnership Agreements**

16.     Rosenbloom has not attended a Partnership meeting nor responded to emails from Plaintiffs since approximately September 2020.

17.     In February 2021, Freedman had a conversation with Rosenbloom, in which he provided her with a phone number for Susan, because he had become relatively unresponsive related to Partnership business.

18.     On August 2021, Larry Rosenbloom, Rosenbloom's son ("Larry"), joined a Partnership meeting on Rosenbloom's behalf, stating that it was not a good idea for his father to join, and did not provide further explanation.  Plaintiffs requested that Larry provide proof that he had authority to act on his father's behalf.

19.     At the same Partnership meeting, the Partners acknowledged that because the Partnerships did not have counsel at the time, they did not know whether Rosenbloom's son could vote on his behalf.

20.     During an October 2021 Partnership meeting, on information and belief, Rakosi concealed Rosenbloom's incompetence from the Plaintiffs by stating that Rosenbloom was "unavailable."

21.     By misleading the Plaintiffs this way, Rakosi was able to maintain a fiction that Rosenbloom was still a voting partner and avoided the reduction of the voting interests to three partners each with a 33.33% voting interest.

22.     On November 14, 2021, Larry again joined a Partnership meeting on Rosenbloom's behalf, stating that he did not yet have a letter showing that he had the right to vote his father's partnership interest, but had requested it from his lawyers.

23.     Again, on November 30, 2021, Larry joined a Partnership meeting without providing evidence of his authority to act on his father's behalf.

24.     On information and belief, Rakosi and Rosenbloom's children (Susan, Larry and Mark Rosenbloom), have been aware, since at least late 2020, that Rosenbloom was declining cognitively and, since at least October 2021, that

Rosenbloom lacked the capacity to manage his own affairs, but failed to disclose those facts to Plaintiffs.

25.     Based upon statements Susan has made to Freedman and to Freedman's daughter in February 2022 and thereafter, Plaintiffs understand that Rosenbloom lacked the capacity to manage his own business affairs.

26.     Susan purports to hold a valid power of attorney ("POA") dated June 2021 and has acted as Rosenbloom's Personal Representative within the meaning of Section 9.2(b)(v) of the Partnership Agreements.  Partnership Agreements (Exs. 1-4), § 9.2(b)(v).

27.     The Personal Representative of an incompetent partner can be admitted as a Partner only upon the vote of a super-majority of the remaining Partners.  Partnership Agreements (Exs. 1-4), § 9.2(d)) ("Any other Permitted Transferee of an Interest in the Partnership shall be admitted as a Partner in the Partnership only upon the consent of the Super-Majority in Interest of the Partners.").

28.      As a result of the Partnership vote on December 28, 2022, Susan was not admitted as a partner and Susan retains only the right to receive allocations and distributions from the Partnerships.  Partnership Agreements (Exs. 1-4), § 9.2(d).

29.     Rosenbloom did not attend the December 28, 2022 Partnership meeting at which the super-majority of the remaining Partners (Plaintiffs) voted not to admit Susan as a voting Partner.

30.     At the December 28 Partnership meeting, Rakosi acknowledged that Rosenbloom was "ill."

### Rakosi and Weber Refuse to Recognize
### Plaintiffs' Super-Majority Vote to Terminate Weber

31.     In March 2019, the Partnerships first held a vote as to whether to terminate Weber's Management Agreement with the Partnerships and were deadlocked, with Plaintiffs voting in favor of termination and Defendants voting against termination.  The Management Agreement and Rider executed in 2017 are referred to herein as the "Management Agreement" and attached hereto as Exhibit 5.

32.     Between March 2019 and December 28, 2022, Plaintiffs have raised objections to Weber's continued employment and raised repeated examples of Weber's substandard performance.

33.     In August 2020, Plaintiffs raised concerns about Weber's Management Agreement and the fact that they had not seen the final terms before Rakosi agreed to them (in handwritten changes).

34.     Beginning in 2019, Plaintiffs repeatedly raised concerns that Weber was not responsive to Plaintiff's phone calls, emails, and requests for information, and that Weber listened and responded only to Rakosi.

35.     On December 28, 2022, Plaintiffs, as a super-majority of the Partners, voted to terminate Weber as manager of the Partnerships and replace Weber with WayFinder Property Management, 20 West 20th Street #1102, New York, New York 10011 ("WayFinder").

36.     On December 28, 2022, counsel for Plaintiffs, as a super-majority of the Partners in the Partnerships, sent Weber a letter notifying it that the Partnerships were terminating it as manager, but Weber has refused to comply with that letter (the "Termination Notice").  A true and correct copy of the Termination Notice is attached hereto as Exhibit 6.

37.      The Termination Notice was sent by certified mail, return receipt requested, as required by the Management Agreement.  Receipt was acknowledged by Weber on January 3, 2023.

38.     Plaintiffs demanded (as a super-majority of the Partners) that Weber:

    a.  cease and desist from representing itself as the managing agent, leasing agent, or sales agent for any of the Partnership Properties or acting in any capacity as an agent for the Partnerships or their Properties;

    b.  turn over all books, records and documents related to the Partnership Properties to Plaintiffs;

    c.  cooperate in the transition of the management duties and functions to WayFinder; and

    d.  take such steps as are necessary to transfer access to all data related to the Properties that it maintains to WayFinder (Ex. 6).

Weber has refused to take any of the steps required to terminate its management role.

39.     To date, Weber has failed to provide Plaintiffs with the books, records and documents related to the Partnerships.

40.     Weber continues to act as and represent itself as the managing agent, leasing agent, or sales agent for the Partnerships, including circulating a financial package to the Partners on January 10, 2022, 13 days after it received notice of termination.

41.     Rakosi has refused to recognize the validity of the vote to terminate Weber.

42.     At the December 28, 2022 Partnership meeting, Rakosi made various statements indicating that he would not accept the validity of the vote, including describing the vote as a "ploy" and saying he would not participate in the vote and that he would "see [Plaintiffs] in court."

### Weber Has Breached Its Fiduciary Duties to Plaintiffs and Misappropriated Partnership Funds

43.     As the manager of the Partnerships Properties, Weber owes fiduciary duties to the Partners and to the Partnerships.

44.     Weber has breached those fiduciary duties repeatedly.

45.     Weber has control of and access to the Partnerships' assets and bank accounts.

46.     Plaintiffs do not have independent access to Partnership funds.

47.     In addition to management fees provided for under the Management Agreement, between at least 2018 and 2020 Weber has taken funds from the

Partnerships as additional fees and payments in violation of the Management Agreement and Weber's fiduciary duties to the Partners.

48.     For example, in December 2018, Weber took $30,000 in commissions based upon residential rentals that were, in fact, not brokered by Weber but were brokered by a third-party real estate broker.  Weber had no basis for taking brokerage fees for those residential leases in contract or equity.

49.     The December 2018 misappropriation by Weber was in breach of its fiduciary duty to Plaintiffs and the Partnerships.

50.     Aaron Weber, a principal in Weber, acknowledged at the time that the $30,000 fee was inappropriate and not provided for by the Management Agreement.

51.     Nonetheless, the $30,000 fee was not returned to the Partnerships.

52.     There have been numerous additional irregularities in amounts taken by Weber since it became manager.  For example, in 2019 and 2020, six payments were made to Weber totaling $45,000, which were coded as "Other" instead of as fees or commissions. Because they were coded as "Other," the payments appeared not as management fees, but as "Legal and Other Professional Fees."

53.     In 2020, Plaintiffs challenged these fees because they were misappropriations.

54.     In response, Weber acknowledged that at least $30,000 of the $45,000 was taken without justification and refunded $30,000 to the Partnerships. Weber has not refunded the remaining $15,000 in wrongful charges, or made any attempt to justify the payment.

55.     In addition to these misappropriations and overcharges, Weber has failed to take certain steps to maximize Partnership income.  For example, Weber failed to seek tenant buyouts prior to a June 2019 Rent Regulation Reform, which would have allowed the Partnerships to seek to convert regulated units into free market units with Individual Apartment Improvements, thereby maximizing income and the value of the Partnership Properties.

56.     On information and belief, Weber has forgiven unpaid rents without obtaining approval of a majority of Partners.

57.     On information and belief, Weber has agreed to reduce rental amounts without obtaining approval of a majority of Partners.

## Weber Breached the Management Agreement

58.     The Management Agreement provides that Weber is to be compensated based upon 4% of "Collectible Rents," i.e., rents payable under leases, whether or not such rent is paid by the tenants.

59.     Weber breached the Management Agreement by not timely notifying the Partnerships and recommending legal action against tenants who failed to pay rent.  Management Agreement (Ex. 5), § 2(i) ("If after one month that tenants and subtenants have been billed for rent and other charges and it has not been paid, Agent shall recommend to Owner that legal action should commence.") (emphasis in original).

60.     Weber has consistently delayed addressing tenants' delinquent payments of rent, resulting in reduced income for the Partnerships.

61. Weber has failed to collect $1.5 million in rents from four commercial tenants, each of which was and/or is behind on rent an average of 20 months. Because Weber is compensated based upon "Collectible Rents" (i.e., Rents owed, even if they are not collected), he received a commission on those outstanding amounts.

62. In addition, on numerous occasions, Weber failed to obtain multiple bids or Partnership approval for work costing in excess of $5,000, as required by the Management Agreement.

63. As discussed further below in ¶¶ 71-89, Weber has also facilitated and aided and abetted Rakosi's breaches of fiduciary duty related to management of the commercial properties by ceding in large part its obligation to manage and allowing Rakosi primary control over the Partnerships' commercial properties.

### Rakosi's Misrepresentations and Breaches of Fiduciary Duties

64. Rakosi breached his fiduciary duty to his partners by, among other things:

> a. Supporting Weber as manager despite its mismanagement of the Partnerships;
>
> b. Supporting Weber as manager despite its self-dealing;
>
> c. Supporting Weber as manager despite its misappropriation of funds;
>
> d. Refusing (until November 9, 2022) to reimburse Plaintiffs for legal fees incurred for the benefit of the Partnerships in clearing title to

Partnership Properties, while reimbursing himself for attorneys'
fees he incurred (related to undisclosed legal work);
and

e. Failing to disclose to Plaintiffs his knowledge of Rosenbloom's
cognitive decline and incompetence.

65.     In the five years since Weber took over management in December
2017, Rakosi has, with Weber's improper acquiescence, unilaterally and without
any authority given to him by the Partners or the Partnership Agreements,
asserted disproportionate control over the Partnerships' real properties, despite
having only a 25% Partnership interest.

66.     Rakosi shut out Plaintiffs and acted with Weber (who responds solely
to the directives of Rakosi), wresting control over routine management and
functions of the Partnerships while Plaintiffs had no access to Partnership funds,
assets, or accounts.  Weber has largely refused to respond to any inquiries from
Plaintiffs.

67.     For example, as early as September 2018,  Plaintiffs proposed
contacting the Partnerships' rent-regulated tenants before the 2019 Rent
Regulation Reforms banning buyouts took effect.

68.     A buyout consultant joined a Partnership meeting explaining that, in
their experience, many tenants who were previously not interested in buyouts were
open to offers after learning that there were only a few months left to receive cash
payments for their regulated apartments.

69.     Rakosi rejected the consultants' proposal and rebuked Plaintiffs for having made him listen to the consultant's proposal.

70.     Despite the Partnership Agreements' provisions that require majority approval for day-to-day management decisions, Rakosi directs Weber in the management of the Partnerships without consulting Plaintiffs.

**Rakosi Has Effectively Taken Control of the Partnerships' Commercial Portfolio, Undermining Majority Rule, Creating Disfunction Within the Partnerships and Damaging Plaintiffs**

71.     Although Weber is bound by its Management Agreement with the Partnerships, not just Rakosi, and is paid fees to manage the Partnerships' portfolio, including the commercial properties, Weber has given control over the portfolio to Rakosi.

72.     Weber does not provide sufficient guidance, management oversight or accountability to the Partnerships related to the commercial properties, which amount to a third of the Partnerships' business, but defers to Rakosi to manage the commercial tenants.

73.     Rakosi has asserted control over the commercial portfolio although the Partnerships compensate Weber for those responsibilities under the Management Agreement.

74.     By deferring to Rakosi, Weber has minimized Plaintiffs' ability to use the Partnerships' property manager to remain informed about Partnership matters and to limit unauthorized conduct by Rakosi.

75.     Rakosi has undermined and effectively replaced the structure agreed to by the Partners in the Partnership Agreements with one that enables him to impose his control over the Partnerships' commercial portfolio.  He has thereby laid the foundation for more pronounced disfunction and minority rule.

76.     Plaintiffs are uncertain how many commercial leases have been amended or extended, rents reduced or the amount of uncollected rent forgiven by Rakosi independently of any vote or authorization given to him by the Partners.

77.     Rakosi has assumed control over negotiations with current commercial tenants and allows limited participation and input from his Partners despite Partnership Agreement provisions requiring majority approval for even day-to-day activities.

78.     For example, in July 2020, when a restaurant space became vacant at 317-19 Greenwich Street, no agreement was reached between the Partners about which broker to use, whether or not to grant an exclusive brokerage agreement or whether to continue to rent it as a restaurant or convert it to another use.

79.     Nonetheless, Rakosi selected a broker without getting majority approval or disclosing to Plaintiffs that his selected broker had put up signage.

80.     Rakosi's broker continues to operate, as he has for the past two and a half years, as though he has an exclusive brokerage agreement, despite his not having any written contract with the Partnerships.

81.   When a second broker of Plaintiffs' choosing tried to arrange a showing, Aaron Weber initially refused the request claiming that there already was an exclusive contract.

82.   After further inquiry by Freedman revealed there was no exclusive brokerage agreement and no contract, a showing was arranged for the second broker by Weber.

83.   The second broker saw the space but could not offer his services because he could not show a client a property covered by another broker's signage. Freedman's broker asked Weber to remove the signage.  Although Weber said it would do so, on information and belief, the first broker's signage remains in place.

84.   This foreclosed Plaintiffs' (and the Partnerships') chance to select another broker and to maximize rental possibilities for the property, including the possibility of converting the space to non-restaurant use that could be insulated from Covid shutdowns and diversify the commercial portfolio.

85.   The tenants who vacated 317-19 Greenwich Street left the premises in a state of such disrepair that it could not be shown to other tenants.

86.   Over two years later, in 2022, the floors of the property at 317-19 Greenwich Street still needed to be swept, garbage was strewn about, the walls and floors were in a state of general disrepair, and a showing of the property had to be postponed because of leaks and the electricity being shut off.

87.   Despite the advice of Rakosi's broker that the property needed to be "white boxed," Rakosi refused to vote in favor of whiteboxing the premises.

88.  Because it has not been whiteboxed or marketed consistent with other properties in the neighborhood, the unit is not competitive with nearby inventory nor marketable to prospective tenants.

89.  Nearly 30 months after it was vacated, 317-19 Greenwich Street remains in a condition that struggles to attract tenants, is vacant and continues to cause losses to the partnership at a rate of over $35,000 per month.

**Rakosi Fraudulently Induced Plaintiffs to Enter the Partnership Agreements By Misrepresenting How The Partnerships Would Be Managed**

90.  Plaintiffs and Rakosi have been aligned as Plaintiffs in two recent lawsuits related to their rights as partners styled *Rakosi, et al. v. Sidney Rubell Company LLC, et al.*, N.Y. Sup. Ct. Index No. 654473/2016 (the "Rubell Litigation"), and *RSR Holding Co., Franklin Holding Co., Belkar Holding Co. & Windshire Apts. v. Family of Jeanette LLC, et al.*, N.Y. Sup. Ct. Index No. 151014/2019 (the "Quiet Title" litigation).

91.  Rakosi made representations under oath in those litigations about how the Partnerships would be managed, upon which Plaintiffs relied in signing the Partnership Agreements, and which demonstrate Rakosi's knowledge of the Partners' rights under the Partnership Agreements—rights that he has ignored unilaterally and without authorization taking control of the Partnerships.

*The Rubell Litigation*

92.  As Plaintiffs do now in this Complaint, in the Rubell litigation, Plaintiffs and Rakosi (individually and on behalf of the Partnerships) sought relief to enforce their legal right to terminate the Partnerships' then management

company, to obtain redress for mismanagement by the management company, and to clear title for properties owned by the Partnerships (the "Partnership Properties").

93.    In the Rubell litigation, Plaintiffs and Rakosi alleged that the manager's refusal to carry out the Partners' instructions or to act in the best interests of the Partnerships had caused and was continuing to cause harm to the Partnerships, the partners, and Plaintiffs by failing, among other things, to:

    a. Take steps to "clear title" with respect to certain of the properties owned by the Partnerships (the "Partnership Properties");

    b. Open a line of credit;

    c. Distribute cash held in Partnership accounts that would be unnecessary as a reserve or for Partnership business;

    d. Obtain competitive bids from multiple vendors for repairs and renovations at the Partnership Properties; and

    e. Make distributions as determined and agreed upon by the Partners.

*See* Complaint, *Rakosi, et al., v. Sidney Rubell Company, LLC, et al.*, NY Sup. Ct., NY Cty., Index No. 654473/16, Aug. 24, 2016, CEF No. 2, a copy of which is attached hereto as Exhibit 7 ("Rubell Complaint").

94.    These failings were so important to Rakosi that he represented to Plaintiffs and the New York Supreme Court that they were causing irreparable

harm to the Partnerships.  *See* Affidavit of Michael F. Rakosi in Opposition to Appellants' Motion for A Stay Pending Appeal, *Rakosi v. Sidney Rubell Company, LLC, et al.*, Index No. 654473/2016, a copy of which is attached hereto as Exhibit 8 ("Rakosi Aff.").

95.    All, including Rakosi, agreed that the remedy was to hire a new management company that would be responsive to the Partners and operate professionally.

96.    Those issues parallel Plaintiffs' complaints against Rakosi and Weber in this case, including making decisions with respect to the management and affairs of the Partnerships without consulting the Partners in violation of the Partnership Agreements.

97.    Ultimately, Plaintiffs and Rakosi were successful in obtaining an injunction from the New York Supreme Court in the Rubell litigation, providing for the removal of the Partnerships' then-manager, SRC.

98.    After Plaintiffs and Rakosi obtained the injunction, requiring that SRC resign and that a new management company be appointed, Rakosi represented under oath that he had "retained a professional, independent manager Weber-Farhat Realty Management, Inc. ("Weber-Farhat") [now Weber Realty Management ("Weber")] to act as managing agent".  *Id.* ¶ 31.

99.    While Rakosi had disclosed that he had worked with Weber before Weber was hired as managing agent, he did not disclose the full extent of their relationship.

100.    Plaintiffs did not know and Rakosi did not disclose that Rakosi had a 30-year business relationship with Weber and that Weber managed and continues to manage Rakosi's other property interests held outside the Partnerships.

101.    Although the Partnership Agreements provide that no action will be taken by the Partnerships, including day-to-day management, without approval of a majority of the Partners, Rakosi consistently acts without Plaintiffs' approval or even providing notice to Plaintiffs of his actions.

102.    Plaintiffs relied upon and were induced to enter the Partnership Agreements in 2018, and declined to object to Weber being appointed manager, by Rakosi's fraudulent representations and fraudulent omissions as to how the Partnerships would be managed.

*The Quiet Title Litigation*

103.    In the "Quiet Title" litigation, Rakosi and Rosenbloom, along with Plaintiffs, brought claims to quiet title to the Partnership Properties.

104.    Due in part to invalid assignments of certain of the Partnership Properties over the years from individual partners to various trusts and other entities, there is a cloud on the title of certain of the Partnership Properties.

105.    On November 4, 2020, Justice Borrok of the New York Supreme Court ordered the parties "to cooperate in good faith and take further necessary and commercially reasonable steps" to "ensure that recorded and insurable title to the Partnership Properties reflects the ownership and economic interests" of the Partnerships.  *RSR Holding Co., et al. v. Family of Jeanette LLC, et al.*, Index No.

21

151014/2019, Stipulation & Order dated Nov. 4, 2020 (NYSCEF Doc. No. 45) (the

"Quiet Title Order"), attached hereto as Exhibit 9.

106.    Despite the 2020 Quiet Title Order and repeated requests from

Plaintiffs to do so, Rakosi and Weber have not taken steps to quiet title for the

Partnership Properties.

107.    Indeed, the Partnerships have been without counsel to represent their

interests and to interpret the Partnership Agreements.

108.    Due to the Partnerships' inaction in response to the Quiet Title Order

and repeated requests from Plaintiffs, Plaintiffs took the initiative to retain an

attorney expert in title clearance and incurred over $35,401 in legal fees to quiet

title to certain of the Partnership Properties and to provide a detailed

comprehensive list of all of the title issues for each of the Partnership Properties.

109.    On information and belief, Aaron Weber initially approved paying

counsel for those legal fees, but refused to tender payment upon Rakosi's

instructions.

110.    Section 5.3(b) of the Partnership Agreements provides that "[a]ny

Partner may charge the Partnership, and shall be reimbursed by the Partnership,

for any reasonable direct expenses incurred in connection with the Partnership's

business and payable to persons other than such Partner or any Affiliate of such

Partner."  Partnership Agreements (Exs. 1-4), § 5.3(b).

111.    In violation of that provision, from December 2021 until November 9,

2022, Weber and Rakosi refused to pay counsel or, ultimately when Plaintiffs were

forced to pay counsel, reimburse the expense of $35,401 incurred by Plaintiffs for the benefit of the Partnerships in clearing titles; Rosenbloom was silent as to the issue as he was not participating as a Partner during this period of time.

112.    Rakosi even went so far as to retain counsel, purportedly on behalf of the Partnerships but without approval of a majority of the Partners, to threaten litigation against Freedman for seeking reimbursement of legal fees incurred in quieting title to the Partnership Properties in compliance with the Quiet Title Order.

113.    Ultimately, in November 2022, nearly a year after demand was made, Rakosi agreed to reimburse Plaintiffs for the attorneys' fees incurred in obtaining advice how to clear title to the Partnership Properties and Rosenbloom's son, Mark ("Mark"), agreed to assist Freedman's son in retaining counsel to clear the Partnership Properties' title.  Mark has not yet responded to Freedman's son's November 2022 emails on the subject.

**Misrepresentations Related to the Line of Credit for the Partnerships**

114.    In a meeting of the Partnerships in October 2018, Rakosi claimed he had been working with the Partnerships' bank for over six (6) months on a line of credit but that he could only secure it if the Plaintiffs signed the Partnership Agreements by the end of the year.

115.    The representation that this line of credit would be available was a significant factor in Plaintiffs' decision to move quickly to sign the Partnership Agreements.

116.    The line of credit was never secured.

**Misrepresentations Related to the Weber Management Agreement**

117.    Rakosi withheld from Plaintiffs material terms of the Management Agreement with Weber.

118.    On or about December 1, 2017, Rakosi signed a Management Agreement with Weber-Farhat (now doing business as Weber) on behalf of the Partnerships.  Management Agreement (Ex. 5).

119.    Plaintiffs were not shown the final terms of the Management Agreement by Rakosi or anyone else before it was signed.

120.    Before it was signed, Rakosi provided Plaintiffs with a version of the Rider to the Management Agreement that did not include handwritten revisions that were ultimately part of the signed version.

121.    The Partnership Agreements provide that, except for matters that require approval of a super-majority of the Partners, "all decisions respecting the management, operation and control of the Partnership's business . . . shall be made based upon the vote of the Majority In Interest of the Partners in favor of the decision."  Partnership Agreements (Exs. 1-4), § 5.1.

122.    Without obtaining Plaintiffs' written approval as required by the Rider and the Partnership Agreements, Rakosi initialed handwritten changes made by Weber, which changed Webers' compensation from a base sum of $150,000 per year, to one based on 4% of "Collectible Rents," a term that is not otherwise defined or included in the Management Agreement.  *Id.*

123.  Plaintiffs would first see the term "Collectible Rents" 15 months after Rakosi approved it unilaterally, without authority to do so, when the executed agreement was first disclosed.

124.  It was only then that Plaintiffs understood that Weber had been taking from the Partnerships, and that Rakosi had agreed to, a 4% fee applied not only to actual rent collected, but also to uncollected rent. *Id.*

125.  The "Collectible Rents" term was particularly objectionable because one of the Partnerships' commercial tenants, an Indian restaurant, was already delinquent for a substantial period of time at the time the Management Agreement was signed.  Thus, from the time the Management Agreement was signed, Weber earned commissions on rent owed by that non-paying tenant, even though the tenant was not paying rent.

126.  Had Plaintiffs been made aware of the amended provisions of the Management Agreement, they would not have agreed to the Management Agreement, nor signed the Partnership Agreements, which were executed almost one year later.

127.  The Collectible Rents provision minimized Weber's financial incentive to pursue unpaid rent and to act in the Partnerships' best interests.

128.  The financial damage caused by disassociating Weber's compensation from the Partnerships' income was seen almost immediately when Weber took several months to initiate legal action against a non-paying commercial tenant, in violation of the Management Agreement.

129.   This damage was further demonstrated in 2020 when indoor dining was banned and New York's Governor issued an Emergency Order barring landlords from evicting tenants and releasing tenants from paying rent – yet because of the Collectible Rents provision, Weber continued to earn fees on tenants that were not paying rent.

130.   The Partnerships did not receive any consideration for the changed provisions of the Management Agreement.

131.   Plaintiffs are not aware what, if anything, Rakosi personally received in exchange for these valuable concessions provided by Rakosi, without notice or consent by Plaintiffs, in the Management Agreement.

**Rakosi and Weber Refuse to Increase Distributions to the Partners in Violation of the Partnership Agreements and in Breach of their Fiduciary Duties and Rakosi Misrepresented That He Would Distribute Unnecessary Reserves in the Prior Litigations**

132.   The terms of the Partnership Agreements require that absent a winding up of the Partnerships, "Net Cash From Operations … shall be distributed … to the Partners in proportion to their Percentage Interests."  Partnership Agreements (Exs. 1-4), § 4.1.

133.   Net Cash From Operations is defined as "the gross cash proceeds from Partnership operations less the portion thereof used to pay or establish reserves for all Partnership expenses, debt payments, capital improvements, replacements and contingencies."  *Id.,* §1.10.

134.   On most occasions, Rakosi has caused the Partnerships to retain reserves such that Net Cash From Operations is not being distributed to the

Partners and the Partnerships are retaining reserves far in excess of those required under Section 4.1 of the Partnership Agreements and doing so without approval by a majority of the Partners.

135.   The reserves currently being retained are approximately $700,000 more than those regularly maintained by the Partnerships' prior management company, which amount Rakosi had objected to as being excessive in the Rubell litigation.

136.   While distributions were discussed in Partnership meetings on occasion, the amounts of nearly all monthly distributions were determined exclusively by Rakosi or by Rakosi in consultation with Weber, without explanation or transparency to Plaintiffs.

137.   This conduct is in violation of the Partnership Agreements, which provide that decisions regarding the management of the Partnerships require at least majority approval of the Partners; certain decisions require super-majority approval, neither of which were sought nor obtained related to distributions. Partnership Agreements (Exs. 1-4), § 5.1.

**Rosenbloom's Breach of Fiduciary Duty**

138.   Rosenbloom breached his fiduciary duty by failing to disclose to Plaintiffs, his partners, his cognitive decline/illness prior to becoming incompetent, which, at the time, would have prevented much of the damage suffered by the Partners and Partnerships thereafter due to continued deadlocks and the Partnerships' inability to terminate Weber due to deadlocks, to seek remedies based

27

upon Rakosi's breaches of fiduciary duty, and to take alternate actions that might have led to renting out empty commercial properties sooner.

### The Partnerships Have Historically Been Deadlocked and Unable to Function

139.    The terms of the Partnership Agreements require that "all decisions respecting the management, operation and control of the Partnership[s'] business… shall be made based upon the vote of the Majority in Interest of the Partners in favor of the decision."  Partnership Agreements (Exs. 1-4), § 5.1.

140.    As a result, prior to Rosenbloom's becoming incompetent, three Partners' votes were required to manage and operate all aspects of the Partnerships' business.

141.    In virtually every recent instance after the signing of the Management Agreement with Weber, no majority has voted in favor of any significant actions proposed to be taken by the Partnerships.

142.    Prior to the December 28, 2022 Partnership Meeting, with the exception of a vote to terminate the Partnerships' accountant, the Partners were deadlocked with 50% voting in favor of a particular action and 50% voting against the same action, preventing the Partnerships from functioning while allowing Rakosi to continue exercising his unauthorized control of the Partnerships.

143.    The years-long deadlocks have prevented numerous actions desired by the Plaintiffs to maintain/improve the Partnerships' assets including adjustment of distributions, clearing of title, signing a commercial broker to identify tenants for lucrative vacant commercial space, changing the management company, white-

boxing vacant commercial space and engaging an attorney to represent the Partnerships.

144.    The deadlocks have allowed Rakosi to continue his control over management and the function of the Partnerships, resulting in lost revenue, poor management and disfunction.

**Plaintiffs Desire to Dissolve the Partnerships But Are Being Prevented From Seeking Dissolution By the Partnership Agreements' Unlawful Anti-Dissolution Provisions**

145.    Because the Partnerships can no longer function, are in a constant deadlock and subjected to Rakosi's and Weber's unfettered control as described in part above *supra* ¶¶ 43-89, Plaintiffs' desire to dissolve the Partnerships.

146.    Because of the Partnership Agreements' anti-dissolution and anti-waiver provisions, Plaintiffs are forced to remain Partners in Partnerships that cannot function and are managed by a management company to which Plaintiffs are opposed, causing Plaintiffs irreparable harm.

147.    The terms of the Partnership Agreements here effectively prevent Plaintiffs from leaving the Partnerships.  *See* Partnership Agreements (Exs. 1-4), Articles X & XI.

148.    Under the Terms of the Partnership Agreements, if Plaintiffs seek dissolution or seek to withdraw from the Partnerships, they immediately cease to enjoy the benefits of being Partners and become subject to punitive and unlawful anti-dissolution provisions under the Partnership Agreements.  Partnership Agreements (Exs. 1-4), §§ 10.2 & 10.3.

149.     Under the terms of the Partnership Agreements, if Plaintiffs seek to withdraw or dissolve the Partnerships, they would be liable for all "costs and liabilities" that the Partnership may incur related to their withdrawal or petition for dissolution, without being entitled to an accounting of such costs and liabilities or access to the Partnerships' books and records.  Partnership Agreements (Exs. 1-4), §§ 10.2 & 10.3.

150.     Plaintiffs would also then be entitled to only:  1) a "Breach Payment," the amount of which would be determined exclusively by the remaining Partners without any obligation for an accounting or access to books and records by the Partner seeking to leave the Partnership; or 2) at the remaining Partners' election, Plaintiffs may be required to continue in the Partnership as an "unadmitted assignee[s] of the interest of" Plaintiffs' Partnership interests (*i.e.*, a non-voting partner holding only economic interests), continuing to receive distributions but without any rights as Partners.  *Id*. § 10.3.

151.     These provisions subject withdrawing Partners to the loss of their rights as Partners, requiring that they either receive a "Breach Payment" without any ability to determine whether such payment is an accurate estimate of the value of their Partnership Interest, or lose their voting (and other) rights as Partners and be prevented from leaving the Partnerships.

152.     Indeed, Section 11.1 of the Partnership Agreements provides that <u>even if</u> this Court were to rule that the anti-withdrawal or anti-dissolution provision

were invalid or to order dissolution of the Partnerships, the Partnerships would continue in complete contravention to the rule of law.  *Id.*, § 11.1.

153.    Section 11.1 further states that <u>even if</u> "a court of competent jurisdiction" determines that the Partnerships have dissolved, "the Partners hereby agree to continue the business of the Partnership[s] without a winding up or liquidation."  *Id.*

154.    The Agreements expressly prohibit any partner from seeking to withdraw from or attempting to dissolve the Partnerships:

> each Partner hereby covenants and agrees not to (i) take any action to file a certificate of dissolution or its equivalent with respect to itself, (ii) withdraw or attempt to withdraw from the Partnership, (iii) exercise any power under the Act to dissolve the Partnership, (iv) Transfer all or any portion of his interest in the Partnership, (v) petition for judicial dissolution of the Partnership, or (vi) demand a return of such Partner's contributions or profits ( or a bond or other security for the return of such contributions or profits) without the consent of the Super-Majority In Interest of the Partners.

*Id.* § 10.2.

155.    These provisions of the Partnership Agreements are punitive and have the effect of eliminating the possibility of judicial dissolution of the Partnerships.

156.    The anti-dissolution provisions of the Partnership Agreements violate New York law and public policy.

157.    These provisions have the effect of forcing Plaintiffs to continue as Partners against their will

## FIRST CLAIM

## (For Declaratory Judgment as to the Voting Interests in the Partnerships)

158.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 2 through 157 hereof, with the same force and effect as if fully set forth herein.

159.    Based on the foregoing, there is a substantial controversy between Plaintiffs and Defendants, and the Parties have adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

160.    A declaratory judgment here will serve a useful purpose in clarifying and settling the legal relations among the Parties, and will end and afford relief from the uncertainty, insecurity, and controversy giving rise to this proceeding.

161.    Plaintiffs, a super-majority, are being deprived of their ability to manage the Partnerships.

162.    Rosenbloom, an incompetent individual who did not transfer his Partnership interest prior to his incompetence, is no longer a voting partner in the Partnerships.

163.    At the December 28, 2022 meeting, Plaintiffs, a super-majority of the remaining Partners voted to deny Susan Rosenbloom admission as a Partner as Stanley Rosenbloom's Personal Representative.

164.    As a result of Rosenbloom's incompetence and Rakosi's refusal to recognize the validity of the December 28, 2022 vote and Plaintiffs' super-majority status, Plaintiffs seek a declaratory judgment that neither Rosenbloom, nor any

individual in his family, is a voting Partner, and that Plaintiffs therefore hold a super-majority of the remaining voting interests in the Partnerships.

## SECOND CLAIM
### (Rescission)

165.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 2 through 157 hereof, with the same force and effect as if fully set forth herein.

166.    In 2018, Plaintiffs entered into the Partnership Agreements with Rakosi and Rosenbloom.

167.    Rakosi fraudulent induced Plaintiffs to enter the Partnership Agreements based upon false representations and material omissions as to how the Partnerships would be managed.

168.    Plaintiffs justifiably relied on Rakosi's representations to their detriment in agreeing to sign the Partnership Agreements.

169.    The parties can be restored and returned to their pre-contract status.

170.    The harm suffered by Plaintiffs caused by Rakosi's misrepresentations and fraudulent inducement cannot be adequately remedied at law.

171.    As a result of the foregoing, the Partnership Agreements should be rescinded.

## THIRD CLAIM
### (For Declaratory Judgment That The Anti-Dissolution Clauses Are Unlawful)

172.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 2 through 157 hereof, with the same force and effect as if fully set forth herein.

173.    Plaintiffs seek a declaratory judgment that the anti-dissolution provisions of the Partnership Agreements are void as against public policy under New York law.

174.    Based on the foregoing, there is a substantial controversy between Plaintiffs and Defendants, and the Parties have adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment that the anti-dissolution provisions of the Partnership Agreements are void as against public policy and under New York law.

175.    A declaratory judgment here will serve a useful purpose in clarifying and settling the legal relations among the Parties, and will end and afford relief from the uncertainty, insecurity, and controversy giving rise to this proceeding.

176.    Plaintiffs therefore request a declaratory judgment that Sections 10.2, 10.3 and 11.1 are invalid under New York law.

WHEREFORE, Plaintiffs demand judgment in their favor, and against Defendants:

1.    On the First Claim, a) declaring that Rosenbloom is no longer a Partner pursuant to Section 9.2(d) of the Partnership Agreements by virtue of his lack of competence and the December 28, 2022 Partnership vote not to admit Susan

34

as a Partner, and b) granting a permanent injunction against Weber:  i) compelling it to cease and desist from acting as the manager for any of the Partnerships or Partnership Properties:  317-319 Greenwich Street, New York, New York; 168-172 8th Avenue, New York, New York; 278 West 19th Street, New York, New York; 325 West 4th Street, New York, New York; 348 West 23rd Street, New York, New York; 206 9th Avenue, New York, New York, 362-364 West 23rd Street, New York, New York; and 360 West 23rd Street, New York, New York; ii) directing Weber to turn over to the Plaintiffs all keys and security codes for the Partnership Properties; iii) directing Weber to turn over to Plaintiffs all books and records relating to the Partnership Properties; iv) directing Weber to turn over to Plaintiffs all accounts of any of the Partnerships or any of the Partnership Properties; and v) directing Weber to cease representing that it is the manager of the Partnerships or any of the Partnership Properties.

2.      On the Second Claim, awarding rescission of the Partnership Agreements based upon Rakosi's fraudulent inducements; and

3.      On the Third Claim, declaring that the anti-dissolution and anti-withdrawal provisions under Article X and Section 11.1 of the Partnership Agreements are void under New York law, together with the costs and disbursements of this action, and

4.      Such other and further relief as the Court may deem just and proper.

Dated:   New York, New York
         January 19, 2023

SCHOEMAN UPDIKE & KAUFMAN LLP

By: _____
       Beth L. Kaufman
       Patricia C. O'Prey
551 Fifth Avenue
New York, NY 10176
bkaufman@schoeman.com
(212) 661-5030

*Attorneys for Plaintiffs*